**AMF TUBOSCOPE, INC., and American Machine & Foundry Co., Plaintiffs,**

v.

**ARROW PIPE SERVICE, INC., and Joe H. Cunningham, Jr., Defendants.**

**Civ. A. No. 9892.**

United States District Court
W. D. Oklahoma,
Oklahoma City Division.

March 10, 1964.

Alfred P. Murrah, Jr., Rainey, Flynn & Welch, Oklahoma City, Okl., Paul E. Harris, Bryan Medlock and Tom Arnold, Houston, Tex., for plaintiffs, AMF Tuboscope, Inc. and American Machine & Foundry Co.

Jerry J. Dunlap, Dunlap, Laney & Hubbard, Oklahoma City, Okl., W. Samuel Dykeman, Lybrand & Morgan, Oklahoma City, Okl., for defendants, Arrow Pipe Service, Inc. and Joe H. Cunningham, Jr.

CHANDLER, Chief Judge.

The above entitled cause came on regularly for trial and the Court having duly considered the evidence and being fully advised in the premises now finds the following:

### FINDINGS OF FACT

**1.**

Plaintiff, American Machine and Foundry Co., is a New Jersey corporation having its principal place of business in New York, New York.

**2.**

Plaintiff, AMF Tuboscope, Inc., is a Texas corporation having its principal place of business in Houston, Harris County, Texas.

**3.**

Defendant, Arrow Pipe Service, Inc., is an Oklahoma corporation having its principal place of business in Oklahoma City, Oklahoma County, Oklahoma.

**4.**

Defendant, Joe H. Cunningham, Jr., an individual, resides at 11218 N. Western Avenue, Oklahoma City, Oklahoma, and is President of Arrow Pipe Service, Inc.

**5.**

This action was instituted by Tuboscope Company on October 18, 1962, and charges both Defendants with infringement of United States Letters Patent No. 2,650,344 granted on August 25, 1953, to Donald Lloyd and entitled "Magnetic Testing Apparatus"; United States Letters Patent No. 2,685,672 granted August 3, 1954, to Berry G. Price and Fenton M. Wood and entitled "Apparatus for Magnetic Detection of Flaws in Ferromagnetic Pipe"; and United States Letters Patent No. 2,746,012 granted on May 15, 1956, to Berry Glenn Price and entitled "Inductive Electromagnetic Inspection".

**6.**

All of the patents in suit were assigned to Tuboscope Company before issuance thereof. On or about October 8, 1963, all of the patents in suit were assigned to Plaintiff American Machine and Foundry Co., and, thereupon, Plaintiff American Machine and Foundry Co. granted an exclusive license under all of the patents in suit to Plaintiff AMF Tuboscope, Inc.

**7.**

On or about December 10, 1963, American Machine and Foundry Co. and AMF Tuboscope, Inc., were substituted as Parties Plaintiff in this case.

**8.**

Plaintiffs elected to rely upon claim 9 of patent No. 2,650,344 and all of the claims of patents 2,685,672 and 2,746,012; there being two claims in patent No. 2,685,672 and three claims in patent No. 2,746,012.

**9.**

The case came on for trial on March 2, 1964; models of the Plaintiffs' and Defendants' devices were exhibited to the Court, but none of such devices were operated. The Court heard the testimony of Fenton M. Wood, Director of Research for Plaintiff, AMF Tuboscope, Inc.; Berry Glenn Price, Manager of Engineering for Plaintiff AMF Tuboscope, Inc.; Joe H. Cunningham, Jr., the individual Defendant and the President of Defendant Arrow Pipe Service, Inc.; Donald Lloyd, who acted as an expert witness on behalf of Defendants; and R. B. McCloy now of Big X Drilling Company

and formerly with Stanolind Oil and Gas Company. The Court also considered the depositions of Kenneth W. Cochran, L. O. Carpenter, L. J. Huston, Joe H. Cunningham, Jr., and Berry Glenn Price.

### 10.

All of the patents in suit relate to electromagnetic inspection devices and are disclosed in the patents in suit as being primarily for the inspection of drill pipe used in rotary drilling in the oil fields. Basically, these devices utilize one or more magnetizing coils, which, in use, are telescoped over a joint of drill pipe and moved down the length of the joint to magnetize the pipe. Patent No. 2,-650,344 shows the use of two such coils, one being energized by direct current and the other being energized by alternating current. The devices also utilize two or more pickup coils which are arranged to extend partially or completely around a joint of drill pipe and are moved down along the outer surface of the pipe to cut magnetic lines of force emanating from the pipe. The voltages generated in the pick-up coils are recorded by a suitable recording device, such as a galvanometer. All of these devices operate on the principle that a defect in a joint of magnetized pipe will provide an abrupt change in the magnetic flux density in the locality of the defect, and a pick-up coil passed through such magnetic flux will have a voltage generated therein, which, when recorded will provide an indication of the location of the defect.

### 11.

Patent in suit No. 2,650,344 discloses, in one embodiment, a magnetic testing apparatus comprising a carriage shaped to surround approximately one-half of a joint of drill pipe and supported on the pipe by a plurality of rollers. A DC magnetizing coil and AC pulsating or vibrating coil are carried in concentric relation on one end of the carriage and are sized to surround the drill pipe in order to magnetize and vibrate the pipe as the carriage is moved along the length of the pipe. A series of pick-up coils are positioned in the opposite end of the carriage and are physically arranged to scan approximately one-half of the surface of the pipe. Adjacent coils of the series of pick-up coils are connected in opposing relation, and the coils are substantially aligned around the corresponding portion of the circumference of the pipe being inspected in order that the coils will all respond uniformly to transversely uniform magnetic fields around the pipe, whereby the voltages generated in the coils connected in one direction will cancel out or buck the voltages generated in the coils connected in the opposite direction. However, the coils are slightly staggered, with the rear edges of the foremost coils being aligned with the forward edges of the rearmost coils, such that a fatigue crack occurring in the pipe at a position to underlie the ends of adjacent coils as the carriage is moved down the pipe will cause a voltage to be generated in one of the coils in one direction and the other coil in the opposite direction a short time later. Thus, a recording device connected to the pick-up coils will provide indications of the occurrence of the fatigue crack.

This patent also discloses an inspection device utilizing the vibrating coil and a DC magnetizing coil supported around the outer surface of the pipe and with a pick-up coil assembly arranged inside of the pipe which is pulled through the pipe while the magnetizing and vibrating coils are moved over the outer surface of the pipe. In this latter embodiment, the pick-up coil assembly comprises a pair of shoes curved to conform to the inner surface of the pipe and urged outwardly into engagement with the pipe by springs guided by rods. Each shoe has a coil slot or recess in the surface thereof facing the pipe in which the pick-up coils are disposed.

### 12.

Claim 9 of patent 2,650,344 calls for a pair of pick-up coils of particular shape and arrangement to provide a minimum response to a uniform magnetic field surrounding a joint of pipe and yet respond

to defects in the pipe, in the manner set forth in the preceding finding. The introductory phrase of claim 9 ("In apparatus of the character described") calls, by reference, for a magnetizing coil and a vibrating coil to be used in combination with the particular pick-up coils set forth in the claim.

### 13.

Patent in suit No. 2,685,672 discloses a magnetic detection apparatus comprising a tubular carriage or head of a size to be placed around a joint of pipe to be inspected, and with the carriage being formed in two halves hinged together for convenience in placing the carriage around a joint of pipe. A plurality of pick-up shoes are secured in the carriage in two circumferential rows extending around the pipe to be inspected. Each shoe comprises a body of non-magnetic material curved to fit the outer surface of the pipe to be inspected and is held in position by guides extending from the carriage into slots in the opposite ends of the shoe. Each shoe is held a short distance from the surface of the pipe by a plurality of wear-resistant tips secured to the inner surface of the shoe, and the shoe is urged toward the pipe by a spring reacting with the carriage. Each shoe is formed with a recess in the inner face thereof and a coil slot extending outwardly from the recess to receive a single pick-up coil. The recess is filled with a non-magnetic foil when the pick-up coil is in place to protect the pick-up coil and retain the pick-up coil a desired distance from the surface of the pipe being inspected.

### 14.

Claim 1 of patent No. 2,685,672 defines the construction of the pick-up shoe basically in the manner set forth above. Claim 2 of this patent is dependent on claim 1 and further calls for the specific construction of the carriage which supports the shoes.

### 15.

Patent in suit No. 2,746,012 discloses four different arrangements of pick-up coils wound and positioned to provide cancellation of the effects of certain magnetic fields surrounding a joint of magnetized drill pipe. In Fig. 4 of the patent there is disclosed four pick-up coils connected in series to a recording galvanometer, with two of the coils being arranged in what may be considered a front row extending circumferentially around the pipe and two coils in a back row also arranged to extend circumferentially around the pipe. Each of the front coils is connected in opposing relation to the other front coil, and each of the back coils is connected in opposing relation to the other back coil in order that the coils will not be responsive to a uniform magnetic field extending circumferentially around the pipe, such as would be created by a ring-groove in the pipe being inspected. The coils in the back row are staggered with respect to the coils in the front row, such that each coil in the back row is positioned with respect to a corresponding coil in the front row along an angle to the transverse plane of the pipe being inspected, and the coils in each of such offset pairs are wound in opposing relation. The patent discloses that the angular arrangement of the pick-up coils is provided to cancel out the effects of a magnetic field surrounding a joint of pipe in a helical pattern. However, the patent does not disclose the angle or angles of the helical pattern and persons skilled in the art have not been able to find such a helical pattern using the disclosure of the patent.

### 16.

All of the claims of patent No. 2,746,-012 call for coil arrangements of the type disclosed in Fig. 4 of the drawings of the patent.

### 17.

A joint of magnetized drill pipe has a surrounding field of magnetic flux which is, of course, invisible to the human eye. This magnetic field may be visualized as a fog around the pipe which varies in density along the length of the pipe. This magnetic field is normally very ir-

regular along the length of a joint of drill pipe. It will vary from joint-to-joint, and will vary from one end of a joint to the other end. A magnetic field pattern in the form of a helix has been observed in drill pipe, but such a pattern is the exception and not the rule. Plaintiffs admitted at the trial that only a minor portion of the drill pipe in use today has a helical magnetic pattern.

18.

On or about November 15, 1947, Donald Lloyd and Kenneth W. Cochran, then associated with the Sclerograph Corporation in Oklahoma City, Oklahoma, were hired to inspect core barrels and some of the drill pipe being used by Stanolind Oil and Gas Company in drilling a well a short distance west of Lindsay, Oklahoma and known as the Briscoe No. 1. Mr. Lloyd and Mr. Cochran inspected the Stanolind equipment with magnetic particles when they first went on the Briscoe well in November of 1947. In a short period of time, however, and at least by January 1948, Mr. Lloyd and Mr. Cochran were utilizing an electromagnetic inspection apparatus on the core barrels and some of the drill pipe used in the Briscoe well. This electromagnetic inspection equipment consisted of a DC magnetizing coil and an AC vibrating coil which were passed over the length of the core barrel or pipe to "condition" the specimen. A detection unit was then pulled over the surface of the pipe or core barrel from one end thereof to the other to measure the magnetic flux variation along the length of the test specimen. This detection unit utilized a pair of pick-up coils wound in opposing senses and arranged in the same manner as disclosed in Fig. 2 of the patent in suit No. 2,650,344. Sclerograph Corporation was paid for the inspection work done with such electromagnetic inspection equipment.

19.

Mr. Donald Lloyd completed the development of his inspection device as illustrated in Figs. 1 through 8 of the patent in suit No. 2,650,344 in the early part of 1949, that is, he completed an apparatus as shown in this patent where the magnetizing and pulsating coils are supported on a carriage with the pick-up coils to magnetize a joint of pipe and simultaneously scan the pipe with the pick-up coils in one operation, as contrasted with magnetizing and vibrating the pipe first and then passing the pick-up coils over the pipe as was done in the inspection device utilized at the Briscoe well mentioned above. The application for the patent in suit No. 2,650,344 was filed March 22, 1949, and at least one of the devices of the type illustrated in the 2,650,344 patent was sold to Tubular Service and Engineering Company, a predecessor of the present Plaintiffs, in May of 1949, and equipment corresponding to the construction illustrated in Figs. 1 through 8 of the 2,650,344 patent were in use by Tuboscope Company in June of 1949 on work for which Tuboscope was charging.

20.

All of the claims originally filed in the application for the 2,650,344 patent called for a combination of elements specifically including the vibrating coil, or a combination of steps including vibrating the specimen being inspected. A claim corresponding substantially to patent claim 9 was added to the application by amendment on September 7, 1951. Prior to this time, all of the claims in the application for the 2,650,344 patent included a specific reference to the vibrating coil, and none of such claims made reference to "coils of hairpin shape", "the second end of a first coil approximately adjacent the first end of a second coil", "the trailing edge of the first coil approximately in line with the leading edge of the second coil", nor the "flat surface of said coils being in a plane parallel with the surface of the tested specimen" as specified in patent claim 9. Thus, patent claim 9 enlarged the application so as to embrace for the first time the essential elements of a device which had been in public use approximately 2½ years before the claim was added to the application.

### 21.

Two of the original claims in the application for the 2,685,672 patent in suit (claims 5 and 8) were broad claims which read clearly on the pick-up shoes utilized in the equipment Defendant, Joe H. Cunningham, Jr., purchased from Associated Pipe Inspectors, Inc., and sold to Defendant, Arrow Pipe Service, Inc. During the prosecution of the application for the 2,685,672 patent, the inventors added the following limitations in order to obtain allowance of claim 1 of the patent:

a. an annular recess on the inside surface of the shoe
b. a coil slot opening into the recess
c. a non-magnetic foil in the recess
d. three wear-resistant surfaces
e. guide slots.

None of the pick-up shoes which have been used by Defendants incorporate any of these structural limitations, except for one set of shoes which were modified by the insertion of tungsten tips into the inside surface of the shoes when chrome plating on this surface of the shoes prematurely flaked, or wore off. However, these latter shoes do not contain the balance of the structural limitations set forth in sub-paragraph form above.

### 22.

On or about December 3, 1957, Tuboscope Company, then owner of the patents in suit, brought an action against Trip Check, Inc., of Odessa, Texas, charging Trip Check, Inc., with infringement of the same three patents as are involved in the present case. On or about January 21, 1958, Mr. Price and Mr. Wood, in the company of Mr. Tom Arnold, patent counsel for Tuboscope Company, inspected the Trip Check equipment in Odessa, Texas. Neither Mr. Wood, Mr. Price nor Mr. Arnold have drawings, photographs or memoranda of this inspection. Following this inspection, there was substantial correspondence between Mr. Arnold and the attorney for Trip Check, Inc., wherein Tuboscope Company was attempting to convince Trip Check, Inc., that it should change its construction. In this correspondence,

Mr. Arnold pointed out that at least some of the pick-up coils used in the Trip Check apparatus were wound in opposing senses and requested Trip Check, Inc. to connect all of its pick-up coils in series additive, rather than in opposing relation. The litigation was not settled, but was dismissed by Tuboscope Company, without prejudice, in July of 1958.

### 23.

On or about October 31, 1958, Trip Check, Inc., leased one of its pipe inspection devices to Associated Pipe Inspectors, Inc., of Lafayette, Louisiana, and Mr. L. O. Carpenter (an employee of Trip Check) went with the machine to Lafayette, Louisiana and then operated the machine for Associated Pipe Inspectors. On or about December 11, 1959, this apparatus was sold by Trip Check, Inc., to Associated Pipe Inspectors, Inc., and Mr. L. O. Carpenter continued to operate the apparatus for Associated Pipe Inspectors.

### 24.

In the summer of 1959, Joe H. Cunningham, Jr., went to Odessa, Texas, inspected two of the Trip Check, Inc., inspection devices and watched these devices in operation. Mr. Cunningham then started negotiations for the purchase of one of the Trip Check, Inc., inspection devices, but such negotiations ceased when Trip Check, Inc. sold its remaining devices to Plastic Applicators, of Houston, Texas. During these negotiations, Mr. Cunningham learned that Tuboscope Company had previously brought an infringement suit against Trip Check, Inc., for use of the Trip Check inspection devices and had dismissed such suit. Mr. Cunningham did not learn at this time specifically what patents Tuboscope Company had charged were being infringed by Trip Check, Inc., but simply knew that the infringement suit had been brought and dismissed.

### 25.

In September of 1960, Mr. Cunningham, at the request of Mr. Binford,

President of Associated Pipe Inspectors, Inc., went to Lafayette, Louisiana, inspected the Associated Pipe Inspectors inspection device and Mr. Carpenter demonstrated the operation of the device to Mr. Cunningham. Mr. Cunningham then proceeded to negotiate the purchase of a copy of the Associated Pipe Inspectors device and such negotiations were completed on September 19, 1960. In making this purchase, Mr. Cunningham relied upon the previous actions of Tuboscope Company in its infringement suit against Trip Check, Inc., and believed that a device constructed in the same manner as the Associated Pipe Inspectors device (which was the same as the device being used by Trip Check, Inc., during the Tuboscope vs. Trip Check suit) was free of infringement of Tuboscope's patents.

### 26.

Mr. L. O. Carpenter delivered the device purchased by Mr. Cunningham. Except for the head used for five inch drill pipe, the device delivered to Mr. Cunningham was made from blue prints which were in turn made from the Associated Pipe Inspectors device. Upon receipt of the equipment, Mr. Cunningham found that the galvanometer pin was broken and obtained the services of Mr. L. J. Huston to repair the galvanometer. In inspecting the equipment Mr. Cunningham had purchased, Mr. Huston found that the pick-up coils were mounted in the pick-up shoes in a very unworkmanlike manner and proceeded to reload the shoes in order that the pick-up coils would be more uniformly sensitive. No other repairs or modifications material to this suit were made to the equipment Mr. Cunningham has purchased from Associated Pipe Inspectors. The five inch drill pipe head received by Mr. Cunningham and referred to above was an inspection head which had been sold by Trip Check to Associated Pipe Inspectors.

### 27.

Joe H. Cunningham, Jr., operated the equipment he purchased from Associated Pipe Inspectors as an individual, doing business as Arrow Pipe Service, from November or December of 1960 until December 1, 1961. Thereupon, Mr. Cunningham sold all of his inspection equipment, which included vehicles and equipment used in other inspection services, to Arrow Pipe Service, Inc., an Oklahoma corporation, one of the Defendants in this case. Arrow Pipe Service, Inc. utilized such equipment from December 1, 1961 and was doing so at the time of the trial of this case.

### 28.

The equipment purchased by Mr. Cunningham from Associated Pipe Inspectors, Inc., comprised three inspection heads with different sizes of pick-up shoes to adapt the heads to all sizes of drill pipe desired to be inspected. Each head utilized a series of eight pick-up shoes arranged in two rows of four shoes each extending around the circumference of the pipe to be inspected, and with the two rows of shoes being spaced from one another along the length of the pipe being inspected. Each shoe contains a pick-up coil and the shoes in one row are staggered with respect to the shoes in the other row, in order that the pick-up coils will scan the entire circumference of a pipe when the head or carriage is moved along the length of the pipe. The pick-up coils used are less than $\frac{1}{4}''$ wide and, in use, are spaced from one another along the length of the pipe being inspected a distance of approximately $\frac{1}{2}''$. The four pick-up coils positioned on the upper half of the pipe being inspected are connected in series to one recording galvanometer and the pick-up coils on the lower half of the pipe are connected in series to another recording galvanometer. Of each set of four pick-up shoes, the two coils in one row are wound in one direction and the coils in the other row are wound in the opposite direction to provide what has been illustrated by the evidence in this case to be two plus coils in the front row and two minus coils in the back row connected to a common galvanometer. Mr. Cunningham also received a DC magnetizing

coil which rests on the head or carriage for movement down a pipe with the pick-up coil assembly. The head is driven along the pipe by a pair of drive motors.

### 29.

On or about March 15, 1962, Defendant, Arrow Pipe Service, Inc., leased additional electromagnetic pipe inspection equipment from a company called Lektro Chek. However, this equipment has been used only to a minor degree by Defendant, Arrow Pipe Service, Inc., and the lease expired prior to the trial of this case. Arrow Pipe Service, Inc., has notified the lessor to pick up its equipment. The use which has been made of this equipment by Arrow Pipe Service, Inc., has not been of sufficient extent to be an issue in this case.

### 30.

During the trial, Plaintiff produced two of its commercial inspection heads, but made no attempt to show that their commercial devices follow the teachings of any of the patents in suit, with the exception of the 2,685,672 patent. In this latter connection, the evidence showed that Plaintiff's pick-up shoes did not contain an annular recess on the inside surface thereof.

### 31.

During the trial, Defendants introduced into evidence two books of prior patents to show the state of the art, and a booklet of eleven patents designated by Defendants as most pertinent. These patents show that it was known long before the filing of the application for the 2,650,344 patent in suit to (a) magnetize a specimen to be tested, such as drill pipe, either by passing a magnetizing coil over the specimen or by passing current through the specimen; (b) measure the variations in a magnetic field surrounding a joint of magnetized drill pipe for the purpose of locating defects in the pipe; (c) use one or more pick-up coils shaped to conform to the surface of a joint of pipe and connected in opposing senses to cancel out uniform magnetic fields around the pipe; (d) use a tubular carriage split in half and hinged for ease of placement around a pipe to be inspected and containing one or more pick-up coils; (e) simultaneously magnetize and scan a joint of pipe with pick-up coils; (f) use a wear-resistant material on a pick-up shoe where it engages the specimen being inspected; (g) arrange a pair of pick-up coils at an angle to the axis of a test specimen wherein the angle corresponded with a known helical disturbance in the magnetic field around the specimen; and, (h) arrange pick-up coils in two circumferential rows extending around a pipe to be inspected, with the coils in one row being staggered with respect to the coils in the other row in order to obtain complete coverage of the surface of the pipe.

### 32.

The prior art patent of Knerr et al, 2,124,579, issued July 26, 1938, teaches a pick-up coil arrangement the same in all material respects to that used by Defendants in the apparatus which was purchased from Associated Pipe Inspectors, Inc. Figure 25 of this patent discloses the use of two circumferential rows of pick-up coils wherein the coils in one row are staggered or offset with respect to the coils in the other row, such that the coils will scan the entire periphery of the pipe being inspected. In accordance with the teachings of this Knerr patent, the pick-up coils shown in Figure 25 thereof would be interconnected with all of the coils in each circumferential row being wound in one direction and all of the coils in the other circumferential row wound in the opposite direction in the same manner as is done in the above-mentioned Defendants' apparatus.

### 33.

Each of the claims of patent in suit 2,746,012 must be distorted, such as by reading two elements called for in the claim on one element in the accused structure, in order for the claim to be read on the accused structure.

From the foregoing, the Court further finds:

### 34.

■ Plaintiffs' predecessor brought and dismissed a suit for infringement of the same patents involved in this case approximately 5 years prior to the present suit, charging that apparatus conforming in all material respects with Defendants' apparatus infringed. Apparatus of this same type has been in continuous use from the time of filing the previous suit to the filing of the present suit. Defendant Joe H. Cunningham, Jr., knew of and relied upon the previous action of Plaintiffs' predecessor in believing that Plaintiffs would not press an infringement suit against the apparatus.

### 35.

■ (a) Claim 9 of patent in suit No. 2,650,344 does not constitute invention over the apparatus used commercially by Mr. Lloyd and Mr. Cochran in January 1948, and, further, is invalid for being first inserted in the application for the patent more than the statutory period after admitted commercial use of the exact structure disclosed in the patent.

(b) Claim 9 of patent in suit No. 2,-650,344 is not infringed since the accused device does not use a vibrating coil nor pick-up coils with their ends "approximately adjacent" and "the trailing edge of one coil approximately in line with the leading edge of another coil" as required by the claim. Defendants' front and back coils are separated along the length of the pipe a distance greater than the thickness of the coils. Also, Defendants' pick-up coils are arranged as taught by the patent of Knerr No. 2,124,579.

### 36.

■ Plaintiffs are estopped from utilizing the doctrine of equivalents and thereby ignoring the specific limitations in claim 1 of patent in suit No. 2,685,672, since their predecessor added such limitations to obtain allowance of the claim by the Patent Office. Claim 2 of the patent is dependent on claim 1 and is therefore also not infringed.

### 37.

(a) Patent in suit No. 2,746,012 is based upon a "discovery" of questionable accuracy and the specification of the patent does not teach one skilled in the art how to make and use the invention.

■ (b) The claims of patent in suit No. 2,746,012 can be read on the accused structure only by twisting or distorting the claims; the coils of the accused structure are arranged and connected as taught by the prior art (Knerr No. 2,124,579) and the occurrence of the alleged helical pattern is "de minimus", such that a holding of infringement would be inappropriate.

From the foregoing facts the Court concludes:

## CONCLUSIONS OF LAW

### I.

This court has jurisdiction of the parties and of the subject matter.

### II.

Plaintiffs are estopped from enforcing U. S. Letters Patents Nos. 2,650,344, 2,685,672, and 2,746,012 against Defendants.

### III.

Claim 9 of U. S. Letters Patent 2,650,-344 is invalid, but if valid, is not infringed by the apparatus purchased from Associated Pipe Inspectors, Inc.

### IV.

[6] U. S. Letters Patent 2,685,672 is valid, but neither claim is infringed by the apparatus purchased from Associated Pipe Inspectors, Inc.

### V.

■ All claims of U. S. Letters Patent 2,746,012 are invalid, but if valid, are not infringed by the apparatus purchased from Associated Pipe Inspectors, Inc.

## JUDGMENT

It is so Ordered, Adjudged and Decreed. Costs are taxed against plaintiffs and judgment awarded defendants for their costs herein expended.